[Decided 14 September, 1898.]

### PARRISH v. PARRISH.

[54 Pac. 352]

TRUST EX MALEFICIO—STATUTE OF FRAUDS.—A trust *ex maleficio*, which is not within the statute of frauds, arises where a person, with the intent to eventually appropriate obtains the legal title to property by representing that it will be .managed and held in trust for the grantor: but where the grantee, although honestly intending when the title is taken to carry out the trust, afterward forms the design of defrauding the grantor, the trust is within the statute and must be in writing.

HUSBAND AND WIFE—PRESUMPTION.—The presumption that a purchase of land by a husband in the name of his wife was an advance or settlement and not a trust, is disputable and may be overcome by evidence that such was not the intention of the parties nor the nature of the transaction relied upon: *Parker* v. *Newitt*, 18 Or. 274, and *Taylor* v. *Miles*, 19 Or. 550, cited.

EVIDENCE TO OVERCOME PRESUMPTION.—The presumption that a deed of absolute conveyance, unambiguous in its terms, expresses the intent of the parties· at the time of the execution cannot prevail where fraud vitiates the conveyance itself.

DOWER.—A widow is entitled to dower in land conveyed to her by her husband during his lifetime, but as to which she is held to be a trustee *ex maleficio* for the heirs because of her fraud in procuring the conveyance.

From Marion : HENRY H. HEWITT, Judge.

Suit by S. B. Parrish and others against Mattie A. Parrish, in which plaintiffs prevailed, hence this appeal.

AFFIRMED.

For appellant there was a brief and an oral argument by *Messrs. Geo. H. Willliams, John A. Carson* and *Geo. G. Bingham.*

For respondents there was a brief and an oral argument by *Messrs. D'Arcy & Richardson.*

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

This suit was instituted by the heirs and personal representatives of the late Josiah L. Parrish against his widow for an accounting, and to have her declared a trustee of certain real and personal property which it is alledged she acquired from him either directly or indirectly for their use and benefit. Josiah L. Parrish and the defendant were married in August, 1888, and were aged, respectively, eighty-three and thirty-eight years. On February 1, 1889, he signed a will which purported to devise and bequeath to the defendant all his property, both real and personal, except $170, which was otherwise disposed of. On the same day he executed two deeds which purported to convey to her all his real property. On July 16, 1889, he and the defendant, for the consideration of $400 per acre, contracted in writing to sell and convey to Thomas H. Barnes, William Howard Phelps, William T. Seever and Hugh V. Matthews about seventy-two acres of said real property; $1,000 was paid down, $4,000 additional was to be paid upon the execution of the deed, and the remainder to be secured by mortgage on the premises. The conveyance was made September 27, 1889, to Phelps and Matthews, and the $4,000 cash payment was thereupon made in pursuance of the agreement, and notes and mortgages were executed to the defendant covering the balance of $24,192. On September 28, 1889, all these lands were conveyed to the Salem Land Company. This company subsequently made large payments upon the notes to the defendant, but, being unable to meet them in full, conveyed to her a very considerable portion of said premises, which now stand in her name. On March 20, 1890, the defendant purchased from Matthews, for the consideration of $12,782, a tract of land known as the "Garden

Road Property," consisting of 32.66 acres, and took the title in her own name. This, it is alleged, she purchased with the funds of her husband, and she acquired other small tracts under like conditions. On April 10, 1890, Joziah L. Parrish and defendant made, executed and delivered to F. R. Smith three deeds,— one for the dwelling house in which they were then living, and the lots upon which it was situated, which property is not in dispute, and the other two purported to convey all the real property of which he was possessed at the time of the marriage that had not been subsequently conveyed to third parties ; and upon the same day, and as part of the same transaction, F. R. Smith and wife transferred by their deeds of conveyance the same property to the defendant. Several other parcels of land which belonged to Josiah L. Parrish at the date of the marriage were sold and conveyed prior to the execution of said deeds to Smith, and large sums of money realized therefrom. One parcel may be mentioned as that conveyed to Christian Frickey, February 4, 1890, for $10,-200. It is now sought to have the defendant declared a trustee, for the use and benefit of the heirs and personal representatives of Josiah L. Parrish, of all the lands that she acquired through the several conveyances above referred to; and some others, of small moment, not mentioned, and also of the funds which it is alleged she received for the lands disposed of ; and for an ascertainment of the amount for which she is liable an accounting is prayed.

The complaint states the age of the said Josiah L. Parrish, his consequent infirmities, and his inability, by reason of his alleged enfeebled condition, both physically and mentally, to efficiently and profitably manage his large property interests; that, in pursuance of a mercenary and wicked design to acquire the property of the

deceased wrongfully and without consideration, the defendant, on February 1, 1889, and while the said Josiah L. Parrish was afflicted with a severe attack of apoplexy, and unable to comprehend or intelligently understand the nature of the business in hand, and by reason thereof incapacitated for the transaction of the same, the defendant dictated the will ·and deeds of that date, and procured their execution by him to her; that thereafter the said Josiah L. Parrish partially recovered from said attack, and the defendant, well knowing that he was incapacitated from making said will and deeds, and deeming said documents worthless for that reason, set about to cheat, overreach, and defraud him of his property, and to cause other deeds to be made to her at a time when he could execute the same and understand their purport; and in furtherance of the said wicked design she repreresented and pretended to him that because of his infirmity he could not efficiently conduct his business and manage his said property, and that, if he would place the title to all of said property in her name, she would safely keep, manage, and protect the same for his use and benefit, and to his best interest, and that she would hold the said property and its proceeds and accumulations in trust for him; that said Parrish was ignorant of the pretended will and deeds signed February 1, 1889, and was ignorant of defendant's intention to cheat and defraud him, and of her scheme and aim to wrongfully acquire the title to his property in order that she could claim it as hers, and thereby appropriate the same to herself; and, relying upon her honor as his wife, and upon her business capacity, and fully believing that his property and business affairs could be more fully and efficiently subserved and managed by defendant than by himself, and relying upon her promise to manage said property and business, and safely keep and retain the

same in trust for him and for his use, he yielded to her persuasions and importunities, and did, on or about September 1, 1889, agree that said property should thereafter be transferred to defendant for said reasons and purposes, and not otherwise. Then follow specific averments concerning particular transactions, tracing the manner of transfer and final acquirement by her of the legal title to all the property in controversy, and finally that the defendant has never accounted for any of said property, but has appropriated it to her own use, and now fraudulently and illegally claims to own the same. These allegations constitute the gist of plaintiff's cause of action.

The defendant, who is appellant here, contends that the complaint is framed upon the theory of an express trust, and, as it is admitted that there was no note or memorandum in writing subscribed by her expressing or declaring the alleged trust concerning such real property, that it is not otherwise provable. It is statutory that no trust or power concerning real property can be created, transferred, or declared otherwise than by operation of law, or by a conveyance or other instrument in writing subscribed by the party creating, transferring, or declaring the same, or by his lawful agent under written authority, and executed with such formalities as are required by law : Hill's Ann. Laws, § 781. But trusts arising by operation of law are not within the purview of this statute. · See, also, Id. § 782. Among such are constructive trusts arising *ex maleficio*, which plaintiffs contend is the nature of the one here involved. The two contentions are opposites, and we are to determine which is sustainable under the complaint, and, if the latter, whether the evidence establishes it. Mr. Pomeroy has stated the doctrine touching trusts arising *ex maleficio* as follows : "In general, whenever the legal title to prop-

erty, real or personal, has been obtained through actual
fraud, misrepresentations, concealments, or through
undue influence, duress, taking advantage of one's
weakness or necessities, or through any other similar
means or under any other similar circumstances which
render it unconscientious for the holder of the legal title
to retain and enjoy the beneficial interest, equity im-
presses a constructive trust on the property thus acquired
in favor of the one who is truly and equitably entitled
to the same, although he may never perhaps have had
any legal estate therein ; and a court of equity has juris-
diction to reach the property either in the hands of the
original wrong-doer, or in the hands of any subsequent
holder, until a purchaser of it in good faith and without
notice acquires a higher right, and takes the property
relieved from the trust '' : 2 Pomeroy's Equity, § 1053.
Mr. Justice PAXSON, in *Christy* v. *Sill*, 95 Pa. St. 380,
says : '' It may be said, as a general proposition, that,
whenever a person has obtained the property of another
by fraud, he is a trustee *ex maleficio* for the person so
defrauded.   The reason of it is this : Having perpetrated
a fraud, and by means thereof obtained the property of
another, equity will not permit him to enjoy the fruits of
his fraud, but will hold him to be a trustee for the right-
ful owner.   He is not trustee for the title, for that he
never acquired, but of the thing which he has in manual
possession.''   These and similar cases are not technical
trusts, but constructive trusts, or trusts *ex maleficio*.

Mr. Bispham, in his work on Principles of Equity
(4th Ed. § 91) states the principle in much the same
way.   '' Equity,'' he says, '' as we shall see, makes use
of the machinery of a trust for the purpose of affording
redress in cases of fraud ; as, when a party has acquired
the legal title to property by unfair means, he will be
deemed to hold it in trust for the injured party, who

may call for a conveyance thereof. The party guilty of
the fraud is said in such cases to be a trustee *ex maleficio.*
But in such cases the interference of courts of equity is
called into play by fraud as a distinct head of jurisdic-
tion, and the complainant's right of relief is based upon
that ground ; the defendant being treated as a trustee
merely for the purpose of working out the equity of the
complainant." In *Huxley* v. *Rice*, 40 Mich. 73, it is
said : "It is the settled doctrine of the court that where
the conveyance is obtained for ends which it regards as
fraudulent, or under circumstances it considers as fraud-
ulent or oppressive by instant or immediate consequence,
the party deriving the title under it will be converted
into a trustee, in case that construction is needful for
the purpose of administering adequate relief ; and the
setting up of the statute against frauds by the party
guilty of the fraud or misconduct, in order to bar the
court from effective interference with his wrongdoing,
will not hinder it from forcing on his conscience this
character as a means to baffle his injustice or its effects."
Fraud is the especial element which dominates and
characterizes the cause of suit, and its existence must
become or be made manifest, and it is this that distin-
guishes the trust which equity employs for the purpose
of affording redress from unconscionable conditions and
the promotion of the ends of justice and fair dealing from
a trust of an express or specific nature. He who has
been guilty of the employment of any of the devious and
insidious arts of fraud to the purpose of any undue,
improper or unconscientious advantage ought not to be
permitted to perpetuate the wrong by invoking the
agency of the statute of frauds and perjuries, which
was enacted to prevent the very ends of his accomplish-
ment ; and such is the spirit as well as the letter of the
law, as promulgated by all the authorities, without a

dissenting voice anywhere. "The principle of this court is," says Lord Justice TURNER, "that the statute of frauds was not made to cover fraud." *Lincoln* v. *Wright*, 4 De Gex & J. 16. See, also, *Dray* v. *Dray*, 21 Or. 59 (27 Pac. 223); *Moore* v. *Crawford*, 130 U. S. 122 (9 Sup. Ct. 447); *Jones* v. *Van Doren,* 130 U. S. 684 (9 Sup. Ct. 685); *Darlington's Appeal*, 86 Pa. St. 512 (27 Am. Rep. 726); *Thomson's Lessee* v. *White*, 1 Dall. 434 (1 Am. Dec. 252); *Ryan* v. *Dox*, 34 N. Y. 307 (90 Am. Dec. 696); *Wheeler* v. *Reynolds*, 66 N. Y. 227; and 1 Beache's Modern Equity, § 233.

Without attempting an extended analysis of the complaint, suffice it to say that we are distinctly impressed that it states a cause sounding in fraud, rather than one based upon an express trust. The extreme age and mental infirmity of the deceased are averred. The fact of her taking undue advantage of him while afflicted with a severe attack of apoplexy and wholly incompetent for the transaction of any business, and procuring the execution of the will and deeds of February, 1889, and of her subsequent concealment from him of the fact that such instruments had been made or executed, is set forth by way of inducement, and then follow the allegations of her fraudulent purpose of acquiring the property with the present intention of ultimately withholding it from him and claiming it as her own, while she induced him to believe that it was necessary for her to have the legal title to enable her to more expeditiously and advantageously manage the property and conduct the business appertaining thereto for him, together with the further statement of the manner of her acquirement of the legal title, her refusal to account, and claim of ownership. All which, when the manner of their statement is considered, is sufficient to characterize the complaint as one founded upon matters arising *ex maleficio*, rather than

a trust arising by express agreement of the parties, although it may contain some allegations touching specific transactions which may give color to the theory that it is a declaration upon an express trust.

Pursuing the discussion of the nature of the cause a little further, we again quote from Mr. Pomeroy. He says : "A second well-settled and even common form of trusts *ex maleficio* occurs whenever a person acquires the legal title to land or other property by means of any intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose,— as, for example, a promise to convey the land to a certain designated individual, or to reconvey it to the grantor, and the like ; and, having thus fraudulently obtained the title, he retains, uses, and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit " : Pomeroy's Equity, § 1055. In *Brison* v. *Brison*, 75 Cal. 525 (7 Am. St. Rep. 189 ; 17 Pac. 689), the complaint averred that the husband, being influenced by the wish of the wife to save her the expense of probate proceedings in case of his death, and having confidence in her and relying upon her verbal promise that she would reconvey to him upon his request, made a deed to her absolute in form, but that the promise by which plaintiff was induced to make the deed was in bad faith and false, and made with intent on her part to deceive, and did deceive, the plaintiff; and it was held that the construction that should be given to the averment that the promise was made without any intention of performing it constituted a well-recognized species of fraud. To the same effect, see, also, *Newell* v. *Newell*, 14 Kan. 202 : *Henschel* v. *Mamero*, 120 Ill. 660 (12 N. E. 203) ; *Manning* v. *Pippen*, 11 Am. St. Rep. 46 (5 South. 572). The essence of the fraud consists in the existence

of a wrongful intent at the time to eventually appropriate the property while lending countenance to the belief in the owner that it was designed to be used for, and would finally inure to, his benefit. It differs from a promise with a purpose of complying therewith at the appointed time, and a breach thereof, for it is settled and conceded that a mere failure to fulfill the promise is not fraud, and the statute applies in such a case ; but if the evil intent primarily existed, as above suggested, the transaction is fraudulent, and without the statute.

It remains to determine whether the plaintiffs have established their cause by the evidence produced at the trial. No reliance is placed upon the will or the deeds of February 1, 1889, by appellant, and nothing is claimed for or under them ; and hence it is unnecessary to discuss in detail the transaction which gave rise to their existence, further than to say that Mr. Parrish was in a condition of mind which in all probability incapacitated him from understanding the nature of the transaction or comprehending what was being done, and this the defendant well knew. The next transaction of moment relates to the sale of the seventy-two-acre tract of land. On July 16, 1889, the contract of sale was entered into, as previously stated. At that time Josiah L. Parrish had an account with Ladd & Bush, while the defendant had none. Parrish alone was permitted to check against the account. The $1,000 paid on the date of the execution of the contract appears in this account to his credit as having been placed in bank on the following day, July 17th. Subsequently, on the twenty-seventh of September, 1889, when the deed was made, an additional $4,000 was paid ; but instead of placing this money in the bank to the credit of Josiah L. Parrish, as she evidently did the first payment, she sent it to Portland, and took a certificate of deposit payable to herself. Mat-

thews testifies concerning the transaction : " I supposed it [the land] belonged to Parrish during the negotiations ; but after we consummated the agreement, and had drawn the contract, Mrs. Parrish mentioned to me, when there was no one else present, that there had been deeds made to her to this property, but they were not on record, so that they would deed the property both together to us in this transaction.  *  *  *  It was clearly Mr. Parrish's property, under the arrangement, just like it was before. He called it so, but I made the bargain and settled with her, of course.  *  *  *  She called it his property, and said she was advising and managing it for him.  *  *  *  She wanted Mr. Parrish to consent to having the mortgage made to her, if he would, which he did consent to. We did not pay down entirely for the property, and the mortgage was made back to Mrs. Parrish.  *  *  *  Mr. Parrish would want us to talk to him about the business, and she wanted us to, more or less, and she claimed, and said, being as it was his property, she wanted him to have his will in the matter from time to time, but he was very irritable, nervous, and old, and rather in his dotage, and it was very difficult to get along with him, because he did not comprehend business very well.  *  *  *  Mrs. Parrish had her way, as a rule." Subsequently, on February 4, 1890, Josiah L. Parrish and the defendant sold the tract of land to Frickey for the consideration of $10,200, the greater portion of which the defendant deposited in the bank to her individual credit. This account had been opened but a short time previous,—about the first of that year,— and it was subject to her checks only. On March 20th following, she purchased the Garden Road property for the consideration of $12,782, and paid for it mainly, as she says, with the $4,000 she had on deposit in Portland, and a check upon Ladd & Bush against her account for

$8,500. This account shows a charge of a like amount of that date, so that the funds which went to that purchase are quite clearly traced.

On April 10th following, the deeds were made to her through F. R. Smith, the consideration named being $8,000 ; but, as a matter of fact, none was received by Parrish. These included, as we understand, all the lands of Parrish which he possessed at the date of the marriage remaining undisposed of to other parties. F. R. Smith testifies, in substance, that a day or so prior to the execution of the deeds in question he and his wife were visiting with Mr. Parrish and the defendant, and that when they were about to take their departure Mr. Parrish requested them to return the next day but one, and said he wanted to deed the home property—the dwelling in which they lived, and lots upon which the same was situated— to Mrs. Parrish ; that he had made a deed directly to her for it, and, for fear it was not valid, he wanted to make the transfer to the witness, and then have himself and wife transfer to Mrs. Parrish ; and that he had intended to have had the deed made in her name when he bought the property, but that by mistake it had been deeded to him. The witness further testified that he and his wife called at the time agreed upon, and then it was he ascertained that they intended making more than one deed, and that property other than the dwelling was to be transferred. Witness asked Parrish what it meant, and he said he wanted to have witness sign the other deed, and that it was a matter of business, so that Mrs. Parrish could transact the business for him, as he was not able to get about, and hardly able to attend to business, and that the defendant also said to him that the purpose of the additional transfers was to so arrange it "that she could attend to the business, as he was not able to attend

to it.'' Mrs. Cline, who was present and witnessed the deeds, testified that Mr. and Mrs. Parrish asked her to sign the deeds, but before signing she asked permission to read them over, and that thereupon they explained to her that it was simply for a business transaction, and that Mrs. Parrish hurried her up for fear that Norman Parrish, a son of Josiah L., would come in in the meanwhile and make a row about it. Witness learned from the conversation that Mrs. Parrish was to have the home place where they were living for herself, and the rest of the property was to be conveyed to her so that she could attend to the business for him ; that he did not seem to want to bother with it, and the purpose was to so arrange it that she could attend to the business without so much trouble. Witness further says : ''I heard Mr. Parrish and Mr. Smith talking about the business. I didn't pay much attention to the whole conversation, but I remember him saying to Smith that he was conveying this to her in trust for her to attend to the business for him ; it was not permanent, but in trust.''

In corroboration of these witnesses many others were called, who testify to admissions of the defendant touching the purpose for which she was holding the property in her name. Dr. D. W. Ward testifies that in April, 1890, Mrs. Parrish told him that she was managing the business, and was doing a good deal of business, and that she supposed it would create a good deal of animosity and hard feeling with the children, but that she was managing it accurately, and could account for every dollar of it. Witness inferred from her conversation that she was doing the business for Mr. Parrish because he was not competent to manage it himself. Andrew G. Vaughn testifies that in 1894 he heard a conversation between Mr. and Mrs. Parrish and Dr. Pierce, and that she made the remark that all the land that was there,

and things that belonged to Mr. Parrish, she could account for, and that she was looking after and working for his interest. Dr. Pierce corroborates this statement. He says : "She was talking with me in the dining room when Father Parrish was present, when she told me she had been obliged to take charge of or take the property in her name to manage it for the children ; that Father Parrish was old and feeble, and not competent to do business, and she was doing it for him." Mrs. Eliza Smith says that Mrs. Parrish told her that Father Parrish was not able to attend to business, and had turned it over to her to transact (this was some time in 1893); and J. M. Gross, that in the summer of 1889 Mrs. Parrish told him that she was transacting the business for Mr. Parrish, and that she was the proper party to pay some money to that was due her husband. Samuel Parrish testified that she said to him, in Portland, in 1890, "I want you to understand those deeds were given to me to conduct the business for your father." Testimony was also adduced touching the declarations of Mr. Parrish made prior to and at the time of the transfers, to the same purport. Some were shown to have been made later, but of a contradictory tenor. To these latter we have attached no importance.

As one of her separate defenses, the defendant alleges that all the property referred to in plaintiffs' complaint which the said Josiah L. Parrish conveyed to her was intended as a gift, advancement, and settlement by him to her, and not in trust for him or the plaintiffs. Mrs. Parrish, when called as a witness, denied in the main all admissions attributed to her, and disputed the testimony of Matthews, Smith, and Cline touching the purpose for which she was permitted to take the property in her name. She testifies touching the Smith deeds as follows : "Q. At the time of the making of these Smith

deeds, was there any agreement in regard to the trust? If so, what was the agreement? A. There was no agreement. Q. How were you holding that property, Mrs. Parrish, if not in trust? How were you holding the real estate? A. I think the deeds show I was to have and hold it. Q. Holding it as your own? A. Yes, sir; and to my heirs.'' Touching the same subject she continued on cross-examination: ''Q. What did you mean when you gave this expression, ' that the deeds show I was to have and to hold it to my heirs,' speaking of the deeds made by Fabritus Smith and wife to you? What did you mean by that expression? A. I think I answered that they were mine to convey the property away. Q. Did you think that particular clause in the deed had any significance in making your title to the property any more certain? A. I don't think I thought anything about it. Q. How do you happen to think it now? A. I could not answer that. It happened to come into my mind. * * * I don't think at the time the deeds were made there was any conversation about what they were made for at all; so far as the conversations were concerned, I don't think there was. Q. Why were the deeds made to Mr. Smith? A. I could not answer that. Q. Why were they made by Smith and wife to you? A. To convey the property to me. Q. As a gift? A. I don't know what you would call it. Q. You haven't told why these deeds were made by Mr. Smith and wife to you. A. You remember Mr. Parrish made a will in 1890, and some deeds that were not recorded, and a year afterwards he was taken ill with la grippe, and he had hiccoughs three days and nights, and supposed he was going to die; and some one came and told us that Norman's people had consulted Richardson about breaking this will and taking the property, and told Parrish that, if he hadn't provided for me, that he ought to do it, on

account of the care I was taking of him, and he said
that he had provided for me, and had given me the
property, and supposed those deeds had been recorded.
*  *  *  When he learned those deeds were not recorded,
he was anxious then about the matter; and he said that
he would send for Norman's people, and ask them to
sign a contract to let the will stand,— the disposition of
the property that he had made.  He had no idea and
didn't worry about these two sons.  He thought they
would not bother him.  And he did send for him to sign
the contract to let the papers alone, and he agreed to do
it.   And they had another conversation, and they refused
to do it.   Norman at one time ( about the time that Mr.
Parrish was up and about the house) agreed to it, and
then Mrs. Parrish and he talked with them about sign-
ing the papers to let the papers alone for the considera-
tion of their house, to cost from $1,200 to $1,500, and
they refused to do it; and when they went away he said
he would see whether we have, or the children or him-
self had, the say about what was left of the property;
the property was pretty near all gone, and he thought he
had a right to have the say about what became of it.   I
think he consulted some attorney ( I don't know whom;
probably Mr. Hammer or somebody else) about the best
way to transfer the title.  I think they advised him to
transfer it to somebody else.   Q. Why did you and Mr.
Parrish consider those deeds were not sufficient to con-
vey the property to you, and the will not sufficient to
bequeath you his property?   A. Well, he didn't have
very much —— in any will, because he always held that
they were too easily broken.   Q. Did you have any faith
in a will?   A. I didn't think much about it.   I allowed
him to make a will to satisfy his mind.   Q. What was
his belief with reference to the deeds?   A. He was afraid
— because they had lain so long without being recorded—

he was afraid it would affect the validity of them. Q. Did you think the deeds were all right? A. I thought they would carry the property provided they were recorded. Q. You kept them well? A. Yes; for several years."

There was testimony touching the enfeebled condition of the old gentleman's mind at the time of his marriage to the defendant, and of his forgetfulness and disinclination to transact business, and much that was contradictory regarding his disposition to exercise his own mind and notions touching the management and control of his property rights; but there is no doubt that for the time the defendant had the superior intellect, and dominated in a marked degree the greater proportion of his business transactions. She admits that she attended to whatever business interests he had, but leaves the inference that they were limited after she acquired the property in controversy, and to this extent it must be conceded that she was his business manager and financial agent. The way and manner in which the will and deeds of February 1, 1889, were obtained exhibited a disposition upon her part to possess herself of the property without regard to the condition or fitness of the old gentleman's mind to dispose of it; and then the act of procuring both the will and the deeds covering the same property, "making assurance doubly sure," was one well calculated to throw doubt and suspicion upon the good faith of the transaction. The two instruments were inconsistent in their tenor and effect. The will could only become effective to convey title at the death of the testator, while the deed should have taken effect at the date of its execution, if delivered as she contends. She did not have the deeds recorded, notwithstanding she was their custodian. But when it came to the sale of the 72-acre tract she told Matthews aside, and said

privately, that she held the deeds, but that they had not been recorded, and, in effect, that she claimed nothing for them. In accord with this idea, the first $1,000 payment was deposited in the bank in the name of Mr. Parrish, and was subject alone to his check. But when the deed was made she insisted that the notes and mortgages be made out in her name, to which her husband consented. She took a certificate of deposit for the $4,000 cash paid in her own name. Why she did this is not explained, and whether he directed it or not she does not say.

Shortly afterwards, about January 1, 1890, she opened an account with the bank, and thenceforward all financial transactions of any moment appear to have been conducted in her name. She does not attempt to explain why Mr. Parrish allowed her to take the notes and mortgage in her name, but leaves us entirely to inference for our deductions. She does not say, while claiming nothing for the will or deed formerly executed, that the old gentleman intended to give her the money and the notes and mortgage representing the balance of the consideration for the land sold to Matthews and others, yet from that time forward she claims these funds as her own. Later, when she bought the Garden Road property, and took the title in her own name, she used the $4,000, together with a large proportion of the proceeds of the Frickey tract, to pay for it, and yet she ·testifies that she paid for it with her own funds. If she claimed nothing for the deeds of February 1, 1889, the land sold to Frickey could not have been hers at the time of the sale to him; and, if not hers, how did she obtain the title to the proceeds? This she does not attempt to explain, although constituting a large item, of more than $10,000; and here we are again left to mere inference, looking from her standpoint. Subsequently she obtained

the Smith deeds, the purpose of which is largely explained by the testimony for plaintiffs, and took the title back in her own name to much of the tract conveyed to Matthews & Co., which had to be surrendered in consequence of the inability of the parties to pay for it; and her story touching the Smith deeds is upon its face inconsistent and improbable as respects some of the important features of the transaction.

In support of her contention the defendant invokes two presumptions of law : One, that where the purchase of land is made by a parent in the name of his child, or by a husband in the name of his wife, it will *prima facie* be presumed to be an advancement or settlement, and not a trust; and the other, that a deed of absolute conveyance, unambiguous in its terms, must be presumed to express the intent of the parties at the time of its execution : *Goelz* v. *Goelz*, 157 Ill. 33-45 (41 N. E. 756) ; Hill's Ann. Laws, § 775, subd. 3. The former of these presumptions is disputable, and may be overcome by evidence that such was not the intention of the parties, nor the nature of the transaction relied upon (*Parker* v. *Newitt*, 18 Or. 274, 23 Pac. 246 ; *Taylor* v. *Miles*, 19 Or. 550, 25 Pac. 143) ; and the latter can never prevail where fraud vitiates the conveyance itself. The declarations of the deceased, at the time some of the transactions were effected, that the property with which they were dealing was his, and, as it related to the last transfers, that they were made for the purpose of enabling his wife to transact his business for him, and her admissions from time to time that the land and other property belonged to him, and that the transfers were made to her to enable her to transact the business for him, and that she was holding it for him and his children, and was able to account for all of it in due time, afford a better explanation of the true condition and status of the

property rights than the legal inferences which she has invoked in favor of her title. She was to all intents and purposes his financial agent, acting in a fiduciary capacity ; and, while her intention to appropriate at the time of acquiring the legal title is not made to appear by her positive declarations, yet the whole course of her demeanor towards her husband as it concerned his property indicates quite clearly that she designed that it should eventually inure to her benefit through and by means of the very transfers which she was instrumental in causing to be effected.

She induced her husband to believe all along that she was managing and carrying on his business, not hers, with assets that were his, and that she held the legal title for the purposes of business convenience only. That this constitutes a species of deceit for which the law gives redress we have no doubt, and the defendant will accordingly be declared a trustee *ex maleficio* of the real property in controversy for the use and benefit of the heirs at law of the deceased. Such being our conclusion, plaintiffs' contention that the defendant is not entitled to dower in the real property is not maintainable. The logical deduction is that, as the heirs are entitled to the real property by right of inheritance from him, she is entitled to her dower as his widow. The law declares her to be a trustee *ex maleficio* for the purpose of working out equity. As Mr. Justice PAXSON says, "He is not trustee for the title, for that he never acquired, but of the thing he has in manual possession" : *Christy* v. *Sill*, 95 Pa. St. 380, and Bispham's Equity, § 91. The defendant holds the legal title, which her husband should have possessed but for her fraudulent devices, and we know of no rule of law by which such acts and demeanor on the part of the wife will forfeit her right to dower in her husband's estate.

As it respects the accounting touching the money which the defendant has received from time to time, it is impossible from the evidence to state an account. We are strongly impressed, however, from the testimony, that she has used all the funds received by her in defraying the expenses of the family, conducting the business with which she was intrusted, and in the purchase of the real property now standing in her name, and of which she is declared a trustee for the use of the heirs of Mr. Parrish, and therefore that plaintiffs are entitled to no relief upon this phase of the controversy. The decree of the court below will be affirmed, and it is so ordered.

AFFIRMED.