Argued October 4, decided October 17, 1911.

## HARMON *v.* GRANTS PASS BANKING & TRUST CO.

[118 Pac. 188.]

MORTGAGES—ABSOLUTE DEED AS MORTGAGE—INTENTION OF PARTIES.

1. The intention of the parties at the time an agreement is consummated to execute a deed determines whether title to the property is to be irrevocably transferred, or the conveyance, though absolute in form is to be merely as security for the payment of a debt or the performance of an obligation.

MORTGAGES—EVIDENCE AS TO CHARACTER OF TRANSACTION OR CONVEY-
ANCE—PRESUMPTIONS AND BURDEN OF PROOF—SUFFICIENCY OF
EVIDENCE.

2. Based on the maxim that a person takes ordinary care of his
own concerns (Section 799, L. O. L., subd. 4), a presumption arises
from the execution of an absolute deed that the conveyance evidences
the intention of the parties, except in cases of fraud, the burden of
proving the contrary being upon the party who so asserts; and, while
parol evidence is sufficient for that purpose, yet, in order that title to
real property may be rendered secure, proof of that character ought
clearly to preponderate.

MORTGAGES—CONVEYANCE AS SECURITY—DISTINGUISHED FROM CONDI-
TIONAL SALE.

3. A mortgage is a security for a debt, while a conditional sale
is a purchase, accompanied by an agreement to resell on particular
terms, and a conveyance intended as a sale upon condition must con-
tain, either in the body of the instrument or in other memoranda,
acknowledged by the grantee, the express provisions, the performance
of which authorizes a reconveyance of the premises; and where doubt
exists whether the deed evidences a conditional sale or a mortgage,
equity will resolve the uncertainty in favor of a conveyance designed
as a security for the payment of money.

MORTGAGES—DEED OR MORTGAGE—PAROL EVIDENCE.

4. A deed must speak for itself, and a condition cannot be ingrafted
upon a deed, absolute in form, by parol evidence.

MORTGAGES—ABSOLUTE DEED AS MORTGAGE—SUFFICIENCY OF EVIDENCE.

5. In a suit to have a deed, absolute in form, executed by mort-
gagors to a mortgagee, upon a cancellation of the mortgage and a
surrender of the mortgage note, declared a mortgage, evidence *held*
not to so preponderate for plaintiffs as to entitle them to a decree,
and hence to support a decree of dismissal.

MORTGAGES—ABSOLUTE DEED AS MORTGAGE—SATISFACTION OR SURVIVAL
OF DEBT.

6. One of the crucial tests by which to determine that a deed from
mortgagors to a mortgagee, absolute in form and executed upon a can-
cellation of the mortgage and a surrender of the mortgage note, shall
forever retain the character which it assumes, is the extinguishment
of the secured debt or the abolishment of a part thereof, equal to
the value of the property described; and if the debt is not diminished
by the execution of a deed of the property subject to the lien, it
is reasonably to be inferred from the transaction that the conveyance
was intended by the parties as further security, or was executed to
protect or advance their interests.

MORTGAGES—DEED OR MORTGAGE—SUFFICIENCY OF EVIDENCE.

7. The mortgagee's surrender of the mortgage note and the cancel-
lation of the lien establishes the fact that the entire debt was extin-
guished.

MORTGAGES—REDEMPTION—PERSONS ENTITLED—WAIVER AND SATISFAC-
TION. .

8. Where mortgagors execute a deed, absolute in form, upon rep-
resentations that they would thereunder retain some interest or equity
in the property subject to the lien, and do not thereafter repudiate
the mortgagee's cancellation of the mortgage or surrender of the mort-
gage note, or offer to place the mortgagee in its former status, and
do not allege or attempt to show any fraud on the part of the persons
making the representations, and retain the benefits of the transaction,
they will be held to have ratified the acts of such persons, and not
to be entitled to assert any equity under their absolute deed.

From Josephine:  Frank M. Calkins, Judge.

Statement by Mr. Justice Moore.

This is a suit to have a deed of real property declared
to be a mortgage, and for an accounting.   The facts are
that the plaintiffs C. E. Harmon, G. N. Bailey, and L.
L. Jewell, and defendant J. R. Bailey, on October 1,
1907, gave to the defendant the Grants Pass Banking
& Trust Company, a corporation, hereinafter called
the trust company, a promissory note for $3,000, pay-
able in a year, with interest from that date at the rate
of 8 per cent per annum, stipulating to pay such addi-
tional sum as the court might adjudge reasonable as
attorneys' fees in case suit were instituted to collect
the note, or any part of it.   In order to secure the pay-
ment of the note, the makers thereof executed to the
trust company a mortgage of four quartz mining claims
in Josephine County, of which premises, subject to the
paramount title of the United States, Jewell owned an
undivided two-fifths, and each of the other mortgagors
one-fifth.   In January, 1909, no part of the note having
been paid, the payee insisted upon its discharge, and
threatened to foreclose the mortgage; whereupon the
plaintiffs and the defendant Bailey executed to the trust
company a deed of the mortgaged premises, including
an appurtenant water right, a quartz mill, machinery,
and tools, and received the note, secured a cancellation
of the mortgage, and also obtained the surrender of

an unsecured note. The consideration of the latter relinquishment was the assignment to the trust company of a claim for expenses incurred in moving machinery to the mines.

A contract was entered into March 8, 1909, by the terms of which the trust company stipulated to sell and convey to the defendant the Holman-Foskett Mines Company, a corporation, hereinafter called the mines company, all the property described in the deed referred to, for the consideration of $10,000 of which $500 was then received, $500 to be paid April 1st of that year, $1,000 on the 1st of the succeeding July, and $1,000 a month thereafter, on account of which $7,000 has been paid when this suit was commenced. The plaintiffs asserting that the deed so executed was intended by the parties to the instrument as a mortgage to secure the sum of $3,000 and interest, demanded of the trust company an accounting for the money which it had received under the contract of sale in excess of the original debt and interest, but failing to secure any recognition of their claim this suit was instituted; J. R. Bailey being made a party defendant, because he would not join in the prosecution.

The complaint sets forth the facts hereinbefore detailed, and alleges that the deed was executed as further security, and pursuant to an agreement with the trust company, whereby the mortgagors were to endeavor to sell the mines, and after discharging the indebtedness referred to, the remainder of the purchase price was to have been paid to the tenants in common; that the mortgagors secured as a purchaser of the premises the mines company, with whom the contract of sale was effected with their consent, and they offered to make to it a confirmatory deed, or to execute such other evidence of title to the mines as the court might decree.

The answer denies the material averments of the complaint, and for a further defense sets forth new matter, which is denied by the reply. Based upon the issues thus formed, the cause was tried and the suit dismissed, from which decree the plaintiffs appeal.

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Asa C. Hough.*

For respondent there was a brief and an oral argument by *Mr. O. S. Blanchard.*

MR. JUSTICE MOORE delivered the opinion of the court.

It is contended that a consideration of the situation of the parties to the deed, of the price stipulated as a consideration for the mines, when compared with their value, of the conduct of the parties before and after the deed was given, and of the circumstances attending the transaction shows that in executing and accepting the deed it was intended that the sealed instrument should be security for the payment of a debt, and such being the case errors were committed in dismissing the suit and in not granting the relief sought.

1. The intention of the parties at the time an agreement is consummated to execute a deed determines whether or not title to property was to be irrevocably transferred, or the conveyance, though absolute, was to operate as security for the payment of a debt or the performance of an obligation. *Kramer* v. *Wilson*, 49 Or. 333 (90 Pac. 183) ; *Hall* v. *O'Connell*, 52 Or. 164 (95 Pac. 717: 96 Pac. 1070) ; *Elliott* v. *Bozorth*, 52 Or. 391 (97 Pac. 632).

2. Based on the maxim that a person takes ordinary care of his own concerns (Section 799, subd. 4, L. O. L.,) a disputable presumption arises from the execution of an absolute deed that the conveyance evidences the inten-

tion of the parties, except in the cases of fraud: *Parrish* v. *Parrish,* 33 Or. 486 (54 Pac. 352). In order to overcome the deduction which the law thus expressly directs to be made from particular facts, the burden of proving that a sealed instrument is not what it purports to be is cast upon the party who asserts a different signification. Parol evidence is sufficient for that purpose; but, in order that title to real property may be rendered secure, proof of that character ought clearly to preponderate.

Plaintiffs' counsel seems to place much reliance upon the case of *Stephens* v. *Allen,* 11 Or. 188, 190 (3 Pac. 168, 169), where, in referring to evidence tending to establish the subordinate elements of fact relied upon herein to disclose the intention of the parties, it is said: "As a consequence of this doctrine, each case must be scrutinized and judged by its own surrounding facts and circumstances, and when the result of the evidence is to produce doubt the courts incline to construe the instrument to be a mortgage." The authorities cited to support this declaration of a legal principle are Jones, Mort., § 279; *Conway's Ex'r* v. *Alexander,* 7 Cranch 218 (3 L. Ed. 321); *Edrington* v. *Harper,* 3 J. J. Marsh (Ky.) 354 (20 Am. Dec. 145), each of which refers to a transaction where doubt exists as to whether the conveyance was intended as a mortgage or a conditional sale.

3, 4. If the transfer of a title is made to depend upon the performance of a condition, and at the termination of the limit prescribed for a reconveyance the grantor is not in a situation to keep his promise, or does not desire to perform his engagement, no legal obligation rests upon him to do so. The conditional sale reserves to him a mere option, permitting him to speculate upon the possibility of an enhanced value of the property, and, if his expectations are disappointed in this particular, allowing him to escape liability, but, if his desires are

realized, authorizing him to demand a reconveyance. When, however, the transaction is regarded at its inauguration as a mortgage, the opportunity for hazard respecting any fluctuation in the value of the property is eliminated, and the doctrine of once a mortgage, always a mortgage, controls. Jones, Mort. (6 ed.) § 256. "A mortgage and a conditional sale," say the court, in *Turner* v. *Kerr,* 44 Mo. 429, 431, "are said to be nearly allied to each other; the difference between them being defined to consist in this: That the former is a security for a debt, while the latter is a purchase, accompanied by an agreement to resell on particular terms." A conveyance intended as a sale upon conditions must contain, either in the body of the instrument or in another memoranda, acknowledged by the grantee, the express provisions, the performance of which authorizes a reconveyance of the premises, since, aside from the question of a reformation in consequence of omission by mistake, the deed must speak for itself, and a condition cannot be ingrafted upon a deed, absolute in form, by parol evidence. 2 Devlin, Deeds (2 ed.) § 976. Based on these considerations, the rule has been established in equity that, where doubt exists as to whether the deed evidences a conditional sale or a mortgage, the uncertainty will be resolved in favor of a conveyance designed as a security for the payment of money. The doctrine thus announced has no application to the case at bar, for it is not pretended that an agreement, oral or written, was ever consummated, whereby the mines were to have been reconveyed to the grantors.

The co-operative elements relied upon to reveal an intention to execute and accept a conveyance by way of indemnity will be examined in the order hereinbefore stated. The evidence shows that in January, 1909, no payments had been made on the $3,000 promissory note, though it was due. J. T. Tuffs, the managing

agent of the trust company, demanded a partial pay-
ment, with which Jewell and J. R. Bailey could have
complied, but the other makers of the note were unable
to respond.   The requests for a settlement became more
urgent as the time elapsed; Tuffs threatening to have
the mortgage foreclosed, unless the debt was speedily
paid.   Several conferences were had with him by Har-
mon and both Baileys, in an effort to retain an equity
in the mines, the title to which they offered to convey
to the trust company, if they could secure from the
latter a bond for a deed covenanting to reconvey the
premises upon payment of the mortgage debt; but these
offers were declined.   Jewell was not then on friendly
terms with any of the agents of the trust company,
and never consulted. with them.   His interest, however,
were represented by the other cotenants, who reported
to him the results of all their interviews with Tuffs.   A
term of court was drawing near, at which the mortgage
could have been foreclosed, thereby incurring costs of
suit, attorney's fees stipulated for in the note, and the
possibility of a deficiency judgment, if the property did
not bring enough at a forced sale to satisfy the decree,
to prevent which consequence Harmon, Jewell, and J.
R. Bailey, and the wife of each, on January 6, 1909,
joined in executing a deed of the property to the trust
company.   G. N. Bailey or his wife did not sign or
acknowledge the conveyance until January 16th,   on
which day the deed was taken to the bank of the trust
company for delivery.   At that time the grantors, think-
ing they might, in a few days, be able to effect a sale
of the mines to a party with whom they had been nego-
tiating, Tuffs acceded to their request for an extension,
and wrote on the back of the deed: "Hold until Thurs-
day Jan. 21, 1909."   The expectations of a sale not
having been realized, the deed was filed  for record the
day  following  the  time  so  limited,  whereupon  the

secured note was surrendered to its makers, and the mortgage record satisfied.

The plaintiffs severally testified that at the time their deed was executed the value of the mine was $25,000 or more. The evidence shows that a long tunnel had been run, and many improvements made on the property, which included a five-stamp mill. The mines had been owned by the grantors several years, but with the appliances which they possessed all the gold could not be saved, and for that reason the speculation had never been profitable.

It will be remembered that on March 8, 1909, the trust company engaged to sell the property for $10,000, of which sum only $500 was then paid. T. J. Brinkerhoff, who negotiated this purchase for the mines company, testified that after the contract had been effected Harmon told him the premises could have been secured from the mortgagors for $5,000, which sworn statement was not denied. Jewell testified that as much as $20,000 had been expended in developing the mines, the base ore from which could not be successfuly treated with their mill. On cross-examination this witness, having stated that he had seen the time he would have given $20,000 for the property, was asked: "That was before you knew as much about it as you do now?" He replied: "Yes sir; before I knew as much about mining as I do now."

Q. You wouldn't buy it now?

A. Two fools might meet.

Q. In other words, buying a mine is a good deal like buying a gold brick, is it not?

A. To a certain extent, I think it is.

These replies, made by a man who had learned wisdom by experience, afford the best explanation of the value of most mines, the worth of which is whatever

sum can be obtained from such a buyer as Jewell describes.

The testimony shows that prior to the execution of the deed, Tuffs repeatedly stated to the mortgagors who conversed with him about the matter that the trust company did not desire the property, but needed its money. His granting an extentsion of five days in which to effect a sale of the mines after the deed was tendered confirms his declaration.

G. N. Bailey testified that on January 16, 1909, and prior to signing the deed which he then had in his possession, he saw Tuffs, to whom he said:

"I told him that I was ready, working to sell the property, and asked him if he was in a hurry to have the deed turned over. He said he was. I told him I did not feel like sacrificing my 18 years work, and turn it over to the bank, but should receive something out of it. He said he didn't care if I received $20,000. He didn't want the mine; all he wanted was the deed signed over, so as to secure him, so he could sell the property to get the money for the bank, and we could have what was over."

And that the witness and his wife soon thereafter executed the deed. This sworn declaration respecting the conversation detailed is substantially corroborated by the testimony of W. Harmon, who states that it occurred at Grants Pass, saying:

"I stood probably 20 feet away from Mr. Bailey down the street," but plainly heard the colloquy, in narrating which and referring to Mr Bailey, he deposed as follows: "George says, 'I don't propose giving 18 years work away.' Mr. Tuffs says, 'We are not asking you to. All the bank cares for is its money; we don't care a damn for the mine, if you make $15,000 out of it; you can have all over what is coming to the bank.'"

T. J. Tuffs testified that about the time and at the place stated he met G. N. Bailey, to whom he said: "I

don't want the mine; the bank wanted its money. I was giving them every opportunity to avoid taking over the mine;" but that he did not promise to pay over any surplus in case the deed was executed to the trust company.

The chief circumstances attending and explaining the transaction were the urgent demand of the agent of the trust company that the note for $3,000 and interest be paid; his threat to foreclose the mortgage lien, unless the money was forthcoming prior to a session of the court soon to convene; the inability of the mortgagors to liquidate the indebtedness, or to secure a purchaser of the mines; and their desire to avoid the consequences of a suit. These subsidiary facts induced the execution of the deed.

The plaintiff Harmon wrote a letter to G. N. Bailey, in which, in referring to the proposed conveyance of the mines to the trust company and to what its agent offered, he states: "Tuffs has agreed to give us what money he gets over and above what is coming to them." The person to whom the letter was mailed testified that, relying upon the declaration quoted, he executed the deed.

Jewell also testified that, confiding in the representations made to him by his cotenants that the money received from a sale of the mines by the trust company, after discharging its debt, was to have been paid over to the mortgagors, impelled him to join in the execution of the deed, saying that it was his "understanding" that the surplus was to be returned. Harmon testified that such was his "understanding."

5. The foregoing is thought to be a fair synopsis of the material testimony, which has been set forth at unusual length in order to show the co-operating incidents that seemed to influence the execution of the deed. Looking at all these circumstances in the light most

favorable to the plaintiffs, we do not think that they have made a case which so preponderates as to entitle them to a decree.   From a consideration of all the testimony, some doubt may arise respecting the nature of the transaction, but if a decree of evidence amounting only to a mere state of uncertainty is sufficient to warrant the alteration of a deed, purporting to be absolute, and to authorize it to be construed as a mortgage, when the burden of proof rest upon the party who attempts to establish that fact, it is safe to predict that faith in the certainty of legal titles, the transfer of which is undertaken to be evidenced by formal conveyances, would be very much impaired.

6. The plaintiffs have not made, in our opinion, such a case as the law requires; nor could they well do so without an averment and proof of fraud.   No rule of equity inhibits a mortgagor from conveying to the mortgagee the incumbered property in consideration of a discharge of the indebtedness and a cancellation of the lien.   One of the crucial tests by which to determine that a deed, absolute in form and executed under the circumstances indicated, shall forever retain the character which it assumes is the extinguishment of the secured debt, or the abolishment of a part thereof, equal to the value of the property described.   If the debt is not diminished by the execution of a deed of the property subject to the lien, it is reasonably to be inferred from the transaction that the conveyance was intended by the parties as further security, or was executed to protect or advance their interests.

7. The surrender of the mortgage note and the cancellation of the lien established the fact beyond the possibility of a doubt that the entire debt was extinguished.

8. Some latent equity is invoked in aid of Jewell, on the ground that, relying upon the representations made

to him by Harmon and J. R. Bailey, he was induced to join in executing the deed, believing that in case of a sale of the mines by the trust company any sum of money received in excess of the mortgage debt would be paid over to him on the basis of his undivided interest in the premises. The same legal principle is sought in behalf of G. N. Bailey, on the ground that he relied upon a declaration to that effect contained in Harmon's letter. In order to secure equitable intervention, it was incumbent upon Jewell and G. N. Bailey to do equity. They never repudiated a surrender of the notes or a cancellation of the mortgage, or offered to place the trust company in *statu quo,* so far as they or either of them were capable of doing so. They do not allege or attempt to prove any fraud on the part of the persons who made the representations, and by retaining the fruits of the transaction, With full knowledge thereof, they surely ratified the acts of their agents.

Believing that the testimony fully supports the decree, it is affirmed.                                       AFFIRMED.