Argued March 30, affirmed May 11, 1920.

## JONES v. JONES.*

(189 Pac. 896.)

**Corporations—Evidence Held to Show Indebtedness was Paid by Transfer of Stock.**

1. In suit by children of one brother and his wife against children of another brother to have declared a mortgage a deed of a sawmill from plaintiffs' father and mother to defendants' father, and to secure adjudication stock was transferred as security for indebtedness owing by plaintiffs' father, evidence *held* to show defendants' father held stock as security until a certain date, but that at such time an indebtedness owing to him from plaintiffs' father was paid with five shares, and that defendants' father became absolute owner of such number.

**Mortgages—Evidence Held not to Show Deed a Mortgage.**

2. In suit by children of one brother and his wife against children of another brother to have declared a mortgage a deed of a sawmill from plaintiffs' father and mother to defendants' father, evidence *held* insufficient to meet burden imposed by law on a party claiming that an instrument in form a deed is in reality a mortgage.

**Mortgages—Heavy Burden on Party Claiming Deed a Mortgage.**

3. The law imposes a heavy burden of proof on a party who claims that an instrument formally a deed is in reality a mortgage.

---

*On parol evidence that a written instrument which on its face imports a complete transfer of a legal, or equitable estate or interest in property was intended to operate as a mortgage, see comprehensive note in L. R. A. 1916B, 18.     REPORTER.

From Multnomah: WILLIAM N. GATENS, Judge.

Department 1.

This suit was brought for the purpose of declaring a deed a mortgage, and for securing an adjudication that certain shares of stock were transferred as security for certain indebtedness.

Elihu K. Jones and Emma J. Jones were husband and wife; and Arthur W. Jones, Lillian J. Viggers, Grace V. Jones, Harvey W. Jones, H. Paul Jones and Marietta H. Zimmerman, the plaintiffs, are the children and heirs of Elihu K. Jones and Emma J. Jones. Emma J. Jones died on April 22, 1916, and Elihu K. Jones died on January 7, 1917.

John Halsey Jones was a brother of Elihu K. Jones. The defendants Herman H. Jones, Birdie L. Schalk, Lavina D. Grindstaff and Elizabeth Towne are the children and heirs of John Halsey Jones, who died on March 21, 1906.

The children of Elihu K. Jones and Emma J. Jones commenced this suit in April, 1917, against the children of John Halsey Jones. For the sake of brevity John Halsey Jones will be called John; Elihu K. Jones will be referred to as Elihu; and the children of the respective brothers will be designated by their given names. On September 17, 1895, Elihu and Emma J. Jones gave to John a quitclaim deed for 3½ acres of land upon which a sawmill was located. At the time of the execution of this deed, the grantors were indebted to different persons for a considerable aggregate sum, including a debt of $15,000, which was secured by a mortgage on the sawmill property. The plaintiffs aver that their father also owed $2,600 to John, and that the latter

held, as security for this alleged indebtedness, certain shares of stock owned by Elihu in a corporation known as the E. K. Jones & Company. The plaintiffs aver that in 1895 the owner of the mortgage was demanding payment and threatening foreclosure proceedings. The plaintiffs say that the financial conditions existing throughout the country were such that enforced payment of the mortgage by foreclosure proceedings would have resulted in great loss and perhaps ruin to Elihu and Emma J. Jones. The plaintiffs aver that John, who was in comfortable financial circumstances, seeing the apparent financial distress of his brother and sister-in-law, expressed a willingness to assist them and if possible prevent their financial ruin and save their equity in the mortgaged property. The plaintiffs contend that on September 17, 1895, the deed to the sawmill property was delivered to John with the understanding that he wor'' pay or otherwise take care of the mortgage indebtedness, and that he would take charge of and manage the real property and collect the rents and profits arising from it, together with the earnings and profits from the shares of stock, which the plaintiffs allege John held as security for the alleged $2,600 indebtedness, and that after he had satisfied the alleged debt of $2,600 and reimbursed himself for moneys advanced in the liquidation of the mortgage indebtedness, as well as all sums expended in the payment of taxes or other legal charges upon the property, he would thereupon reconvey the real property to Emma J. Jones and reassign the shares of stock to Elihu. The defendants claim that the deed was given as an absolute conveyance, and that their father was the absolute owner of the shares of stock in controversy. There

was a decree for the defendants, and the plaintiffs appealed.                                        AFFIRMED.

For appellants there was a brief with oral arguments by *Mr. A. H. Tanner* and *Mr. Maurice W. Seitz.*

For respondents there was a brief over the names of *Messrs. Giltner & Sewall* and *Mr. Guy C. H. Corliss,* with oral arguments by *Mr. Russell E. Sewall* and *Mr. Corliss.*

HARRIS, J.—The realty involved in this litigation is sometimes referred to as the sawmill property. Confusion may be avoided, if at the outset we call attention to the fact that since a time prior to September 17, 1895, the sawmill has been owned by one person or corporation and operated by other persons or another corporation. In the beginning Elihu was the owner of the sawmill property. On August 12, 1892, Elihu still owned and held the record title of the sawmill property; and on that date he and his wife gave their note for $15,000 to C. E. Withington, agent, payable three years after date, and they secured the note by mortgaging the sawmill property. On February 12, 1894, J. E. Hazeltine & Company secured a judgment against Elihu. On the following sixth day of July, an execution was issued on the judgment, and the sheriff levied on the sawmill property. At the sale on execution, which occurred on August 13, 1894, the property was struck off to Emma J. Jones for $1,009.04; subsequently on March 1, 1895, she received a deed from the sheriff. The plaintiffs insist that Emma J. Jones paid her own money to the

sheriff; but the defendants contend that the funds were in reality furnished by Elihu, and that she took and held the title merely for the purpose of securing herself against loss by reason of her having allowed Elihu to mortgage a tract of land owned by her in Clackamas County to secure the sum of $5,000 which he had borrowed from Carey Johnson. It is not necessary to decide, and we do not attempt to determine, whether the moneys paid to the sheriff were realized from property which in truth was owned by Emma J. Jones, or whether Elihu furnished the funds. However, regardless of the source from whence came the money paid to the sheriff, the evidence impresses us with the idea that Emma J. Jones held the title as security rather than as absolute owner. Moreover, it must be remembered at all times that the note to Withington was the debt of both Emma J. Jones and Elihu.

The next conveyance is a quitclaim deed made by Emma J. Jones and Elihu to John on September 17, 1895. This controversy is centered around that conveyance. The instrument is witnessed by Ira Jones and Lillian, and it was acknowledged by the grantors before Ira Jones as a notary public. It is appropriate here to say that Ira Jones was an attorney, and that, while there may be room for debate as to whether on September 17, 1895, he represented the grantors or the grantee or all the parties to the deed, the evidence indicates that he was acting for the grantors rather than for the grantee, for there is no evidence that he ever represented the grantee on any other occasion, and it does appear that he had previously acted as attorney for the grantors. The importance of the presence of Ira Jones will become manifest when we come to consider all the cir-

cumstances attending the execution and delivery of this deed. About six years after receiving the deed to the sawmill property, John organized the John Halsey Jones Company, a corporation, for the purpose of holding all properties owned by him, and on May 19, 1901, he conveyed the sawmill property to the John Halsey Jones Company. Upon the death of John, on March 21, 1906, the stock in the John Halsey Jones Company was inherited by his children, and they in effect became the record owners of the sawmill property. Having given an account of the ownership of the record title to the sawmill property, we shall briefly relate the history of the operation of the mill.

On January 2, 1890, Elihu and J. D. Young entered into a partnership for the purpose of manufacturing lumber; and on September 15, 1890, John became a member of the firm. Subsequently on March 17, 1891, John sold his interest to his son Herman, and from that date Elihu, J. D. Young and Herman were partners, doing business under the firm name of E. K. Jones & Company. On January 2, 1892, Elihu leased the sawmill property to the partnership for the term of thirteen years at a rental of $300 per month.

On January 27, 1892, E. K. Jones & Company, a corporation, was organized with a capital stock of $50,000, divided into 50 shares having a par value of $1,000 each. The stock was issued as follows: To Elihu, 17 shares; to John, 1 share; to Herman, 16 shares; and to J. D. Young, 16 shares. The lease held by E. K. Jones & Company, the partnership, was assigned to E. K. Jones & Company, the corporation. On May 19, 1893, Elihu made a new lease to E. K. Jones & Company, the corporation. This

new lease abrogated the lease made to the partnership, and was for a term of 12½ years and for a rental of $200 per month. The lease recites that the corporation is desirous of entering into a contract, not only for the use of the property, but also for the right to purchase it, and it is particularly provided in the instrument that the corporation may purchase the sawmill property at any time within the term of the lease for the price of $50,000. Elihu directed this corporation to pay, and it agreed to pay, $100 of the rental to Withington on account of the mortgage held by the latter. Elihu also directed, and the corporation agreed to pay, the remaining $100 of the monthly rental to Emma J. Jones on account of her having signed a note with him for $5,000, which she had secured by giving a mortgage on her separate property.

On January 14, 1893, Herman transferred three shares of the E. K. Jones & Company stock to Lincoln A. Young; but by December, 1899, Herman and his father had acquired the ownership or gained control of all the stock of this corporation. On December 23, 1899, a corporation known as the Jones Lumber Company was organized with a capital stock of $100, divided into 100 shares with a par value of $1.00 each. Immediately, upon the organization of the Jones Lumber Company, all the assets of the E. K. Jones & Company, a corporation, were transferred to ·the Jones Lumber Company, and since that time the latter has operated the sawmill. It is not clear from the record whether 34 or 56 shares of the Jones Lumber Company were issued to John, although it does appear that Herman and John owned, or at least controlled, all the stock of the Jones Lumber Company from the date of its organi-

zation until the death of John; and since that time the children of John have been the owners of the stock.

1. Before discussing the circumstances attending the execution of the deed dated September 17, 1895, we shall relate some of the details connected with the transfer from Elihu to John of the 5 and 12 shares of stock in the E. K. Jones & Company, a corporation. It will be recalled that upon the organization of the E. K. Jones & Company, a corporation, 17 shares were issued to Elihu, and John received only 1 share. On October 7, 1892, Elihu assigned 5 shares to John, and on that date certificate No. 5 for five shares was issued to John, and to Elihu was issued certificate No. 6 for 12 shares, which was the remainder of the 17 shares originally issued to Elihu. About four months afterward, under date of January 25, 1893, Elihu assigned certificate No. 6 for 12 shares to John, and certificate No. 9 for 12 shares was issued to John. On January 30, 1893, John signed a writing in which he acknowledged that on October 7, 1892, he received 5 shares of stock in E. K. Jones & Company, and that on January 25, 1893, he received 12 shares of stock in the same company, and that he held this stock as security for $2,600, with interest at 8 per cent per annum from October 7, 1892, and that he agreed to retransfer the stock to Elihu, provided the sum of $2,600 with interest was paid within one year. In view of the many debts which Elihu owed and was unable to pay, it is reasonably certain that no part of the sum of $2,600 was paid by him. That an adjustment of some kind was made is certain from the fact that on January 22, 1895, John executed an assignment on the back of certificate No. 9 by which he transferred to Elihu the 12 shares represented by that certificate,

and on the next day, January 23, 1895, Elihu assigned the stock to Emma J. Jones. It is the contention of the defendants that on January 22, 1895, Elihu and John had a settlement whereby the indebtedness of $2,600 was satisfied by John keeping 5 shares as full payment, and returning the 12 shares to Elihu. Herman gives direct testimony in support of this position taken by the defendants, and the circumstances connected with the transaction give strength to that position. Our conclusion is that John held the two certificates for 17 shares as security until January 22, 1895, but that at that time the indebtedness of $2,600 owing from Elihu was paid with five shares, and that John became the absolute owner of that number of shares.

We now come to the deed. Elihu, Emma J. Jones, and John, the parties to the deed, all are dead. Ira Jones, who not only was probably the attorney for the grantors, but was also one of the witnesses and the notary public before whom the deed was acknowledged, is dead. J. D. Young also is dead; and he was for a long time associated with Elihu and John as secretary of E. K. Jones & Company, a corporation, and apparently he was active in the management of the mill, and in all likelihood he knew much, if not all, about the business transactions between the two brothers relating to the sawmill property. Lillian and Grace were present at the execution of the deed, and much reliance is placed on their testimony by the plaintiffs. Lillian was almost 18 years of age in September, 1895, and she signed as one of the witnesses to the deed. Lillian says that she and her mother and her sister Grace were at their home and that her father "came into the house, bringing with him his brother and Ira Jones"; that her father stated that "they had come

to have her sign the deed over" to John; and that her mother "said she would not sign it." The witness explained that her father had previously talked to her mother about signing the deed and that she had told him she would not sign it. When Emma J. Jones would not sign the deed, John, according to the testimony of this witness, said to her mother:

" 'I will return this after the obligations are paid and I get my money out of it; * * I am putting this money in to help you and Hugh [E. K. Jones] just to save the mill. When I get my money out and these debts paid I will return this deed to you; it will come back to you.' My mother said, 'Then give me a written statement to that effect.' She says, 'You have nothing in the deed like that.' She says, 'Give me a written statement to that effect.' Ira Jones said, 'No, we can't do that; that wouldn't be valid.' "

The significance of the statement said to have been made by Ira Jones becomes apparent when we remind ourselves that he was probably acting as the legal adviser of Emma J. Jones and her husband. Obviously, it is fair to assume that Ira Jones had knowledge of the real purpose of the conveyance, whatever it may have been. If the deed was in truth intended to serve as a mortgage, it is difficult to conceive of a rational and consistent reason for the statement ascribed to Ira Jones, the attorney; but, on the other hand, if the instrument was designed to be what it purports to be, the advice given by him becomes intelligent and entirely consistent with outward appearances.

W. P. Shannon, a brother of Emma J. Jones, testified that two or three days before the execution of the deed he learned from Elihu and John that they had been endeavoring to persuade Emma J. Jones

to execute a deed to John, but without success. He says that Elihu and John requested him to intercede with his sister, and if possible persuade her to sign the deed, and that he did interview his sister, with the understanding on his part that John would take over the mill and operate it until the proceeds of the business paid the mortgage and other accounts, and that upon the payment of all the indebtedness John would reconvey the sawmill property to Emma J. Jones. This witness testified that he advised his sister "to take a deed reconveying the property to her and have it placed in escrow"; and that "it was about three days before I got her to agree to it." Shannon also stated on cross-examination that "a part of the proposition" he was to make to his sister was the execution of a reconveying deed which was to be placed in escrow. According to the testimony of Shannon, a few days after the deed in controversy was signed he heard a conversation between Elihu and John, in which the main subject of discussion "was concerning the request of my sister that they would furnish her some paper or other that would show that this was a deed of trust." No other witness speaks about a deed in escrow, and there is no evidence that such a deed was ever executed. The defendants point out certain inconsistencies which they say become manifest if the testimony given by W. P. Shannon is compared with that given by his two nieces.

There was considerable testimony concerning conversations in which John is said to have made statements amounting to express or implied admissions that Emma J. Jones owned an equity in the sawmill property. Most of this testimony relates to conversations about a release to which the plaintiffs say John from time to time importuned their mother

to attach her signature. The plaintiffs contend that their parents never signed any release. The defendants insist that a release acknowledging the settlement of all business transactions was signed by Elihu and his wife on December 20, 1899. Lillian testified that four or five years after the execution of the deed, John told her mother that the mill was going behind, and that he offered Emma J. Jones $100 if she would sign the release—

"So I can make some disposition of the property and do with it as I please, and then I can get my money back and yours, too, and he still urged her to sign it, offering her the money, but she wouldn't sign it."

This witness also testified that a few months after the last-mentioned conversation John offered her mother $200 if she would sign a release, but that her mother said: "I won't sign it for $200." Grace says that she was present when her uncle offered her mother $100 for her signature to a release, but that her mother said "that she wouldn't sign it, that she thought that her equity in the mill was worth more than $100 and she was not going to sign it away for $100." Grace also told about a conversation occurring in 1905, in which her mother asked John, in the presence of her sister Marietta, "when he was going to deed the mill back," and that he responded by saying that "they hadn't got their money out and he didn't know just when they could, and if she had signed the release, why, things might have been different." Marietta corroborated her sister by testifying that she heard her uncle say that had her mother "signed a release things would have been settled, but as things looked, that he didn't know when they would be, the way things looked." Arthur says that "around about 1900" John offered

to give his mother a clear deed to the home in which she lived if she would sign a release, and that ''she told him she would not, and that she had told him before she would not, and never would and said also that she had lost everything that she had, to save the mill, and that she wouldn't sign the very last thing she had away.'' In addition to the testimony of the four plaintiffs, William Paetz, L. A. Young and W. H. Roberts gave evidence about statements which they said were made by John. In the fall or early winter of 1895, according to the testimony of William Paetz, John said, ''I got a deed of trust from'' Elihu. L. A. Young stated that a few days after the execution of the deed he heard John say, in the presence of J. D. Young, that he had taken care of the mortgage (Withington mortgage) so that ''the E. K. Jones Lumber Company should stay in business,'' and that ''he had redeemed that'' because ''he wanted to save this piece of property for'' Elihu. It appears from the record that this witness and Herman are not on friendly terms, and have not spoken to each other for years. W. H. Roberts was another witness for the plaintiffs; but the cross-examination more than neutralized his testimony given on direct examination, and in reality, when considered in its entirety, the testimony of Roberts strengthened rather than weakened the position taken by the defendants.

There was also some evidence which the plaintiffs say shows admissions by Herman, who has been the manager of the mill since the early part of 1899. L. A. Young said that he had heard Herman say ''that his father had taken over this debt to secure this property for E. K. Jones.'' Arthur testified that three or four months after the occasion when

John offered his mother a deed to the home place if she would sign a release, he was visiting at the home of Herman, and that the latter, in the presence of H. M. Bush, who is now dead, asked the witness if he could get his mother to sign a release, and then stated, "I think that is the best thing she can do." Herman vigorously denied any such conversation and gave detailed reasons for claiming that such a conversation never occurred. Moreover, the testimony of Arthur must be read in the light of a letter addressed by him on March 14, 1915, to Herman, in which the writer asks a favor, and from which the reasonable implication is that the writer had no claim upon the sawmill property.

The defendants also rely upon evidence of oral admissions, which they claim were made by Elihu and Emma J. Jones. W. H. Grindstaff testified that Elihu told him—

"That his financial condition was so that he was figuring on selling the mill to John; * * that he would rather have him own the property than an outsider"; and shortly after Elihu "stated that he had sold the mill to J. H. Jones for the reason that he understood that other people were figuring on getting hold of it, and he repeated that he would rather see his brother own the mill than an outsider."

Elizabeth stated that "within a very few days" after the execution of the deed Elihu told her that "he had sold, he and Emma, all their interests in the mill and the mill business to my father." J. H. Struble testified that in 1912 Elihu said "that he had sold out to John a long time ago." Birdie Schalk testified that Emma J. Jones said to her on one occasion:

"Your father is going to save his $100,000 worth of property, but we have lost all of our property, and I sometimes think that Hugh has no more business sense than a child."

If the controversy were to be decided solely upon the testimony of conversations and oral admissions, it might be said that the plaintiffs had made out the stronger case. But the litigation cannot be determined on this character of evidence alone, for there is much additional evidence which harmonizes with the contention of the defendants rather than with that of the plaintiffs.

Before noticing other prominent features of the record, we shall first point out the condition of Elihu's finances in September, 1895. The Withington mortgage was overdue, and the mortgagee was insisting upon payment and threatening foreclosure proceedings. On May 2, 1895, F. F. Winters secured a judgment against Elihu and others for $723.65, with interest at 10 per cent from December 8, 1892, together with costs. In August, 1895, William Paetz began an action to recover $550 with interest, and he caused the sawmill property to be attached.

The deed states that $1,600 is the consideration; but the defendants contend that the conveyance was made to John with the understanding that he would pay the Withington mortgage and other debts; and the defendants also say that Elihu preferred that his brother should have the property rather than it should fall into the hands of outsiders. Herman testified that a few days before the execution of the deed he heard his father and uncle discussing the terms of the proposed sale, and that, in addition to the payment of cash, the amount of which he did not remember, his father was to satisfy the mortgage, pay the Paetz claim and the Winters judgment, and

assume a debt which Emma J. Jones owed to the E. K. Jones & Company. The record shows that John paid the Winters judgment on September 18, 1895, and that he paid the Paetz claim on the same day. The ledger of E. K. Jones & Company, discloses that Emma J. Jones owed $258.96, and, in figures which "look like J. D. Young's," the ledger indicates that John assumed that debt; and the journal "says that $258.96 was charged to J. H. Jones account; and Emma J. Jones account was given credit for that same amount $258.96." The Withington mortgage was fully paid in 1902 by the John Halsey Jones Company. The two plaintiffs, who were present when the deed was signed, say that no cash was paid at that time. There is no evidence of the payment of any cash, except the testimony of Herman, already referred to, and the recital in the deed.

The plaintiffs argue that the value of the sawmill property was greatly in excess of $1,600, the consideration in the deed, plus the amount of the debts paid by John, and that this circumstance speaks loudly in support of their contention. Two witnesses, W. P. Shannon and L. A. Young, stated that the property was worth about $50,000 in 1895; but B. D. Sigler, who was in the sawmill business in 1895 and is now engaged in the business of appraising real estate, testified that the property was worth from twelve to fifteen thousand dollars in 1895, and that the mill's capacity was from twenty-five to thirty thousand feet per day. James Muckle, a sawmill man, said that in June or July, 1895, he offered Elihu and J. D. Young $12,000 for the sawmill property, but that they wanted $18,000. Muckle also testified that the property was worth from twelve to fifteen thousand dollars at that time. Herman, who

is of course materially interested, says that the property was not worth more than $15,000, and that the average daily cut in 1895 was 18,703 feet. L. A. Young says the mill made a little money in 1893, but none in 1894 or in 1895. Herman states that the mill lost money from 1892 to 1895, inclusive. The uncontradicted evidence is that money was scarce, and the lumber business was extremely bad in 1895. The Jones mill was operating only about three days in each week during the year. Indeed, some of the sawmills were shut down and were not operated at all. Appraising the property as of September, 1895, and fixing extreme minimum and maximum valuations, we think that the property was worth not less than $12,000, and not more than $20,000; and, furthermore, it is very doubtful whether the sawmill property could have been sold for the amount due on the Withington mortgage, if it had been disposed of by the sheriff under a writ of execution.

Plaintiffs claim that John recognized Emma J. Jones' equity by paying a monthly rental of $30. There is evidence to the effect that many monthly payments of $30 were made by John, and that these payments were made sometimes to Elihu, and sometimes to Emma J. Jones. There is evidence in behalf of the defendants to the effect that John, on the night before his death, told Elihu that he had asked Herman "to be good to him." Herman continued to make monthly payments after his father's death. The books of the lessees of the mill property show that the rentals were paid to John until he conveyed to the John Halsey Jones Company, and from that time the rentals, according to the books, were paid to that company. Every witness, who at any time saw any of these monthly payments made, says that in no instance was a receipt given by Elihu, and yet a

receipt appears to have been taken from Elihu whenever he was paid wages for work done in the mill.

We now come to a consideration of the evidence offered in behalf of the defendants concerning the release which they claim was signed on December 20, 1899. It will be recalled that much of the evidence offered by the plaintiffs included oral admissions ascribed to John, and necessarily involved the theory that Elihu and Emma J. Jones did not sign a release, for the reason that much of this evidence related to conversations said to have occurred after December 20, 1899. A search was made for the release, but it was not found. Not long before his death John burned some of his papers. Guy G. Willis was called as a witness and he said that in 1895 he acted as attorney for John, but that he had since retired from the practice of law. Willis testified that when he closed his law office he preserved his files and stored them. After the commencement of this suit, at the request of the defendants, he made an examination of his files, and discovered among the papers an instrument which he states is a copy of the original release which was signed by Elihu and Emma J. Jones. He explained that it was his custom, whenever a paper was signed in his office, to make a copy of it, and to fill in the blanks after the original was signed and to place the copy with his office files, after giving it a file number. The paper produced by Willis as his office copy purports to be a transcript of a formal release. Three blanks are filled with writing made with a lead pencil; one with "20," indicating the day of the month; another with the words "two hundred"; and still another with the figures "200," indicating the consideration for the release. At the bottom was writ-

ten with a lead pencil "E. K. Jones" and "Emma J. Jones." Willis testified that Emma J. Jones "claimed that she hadn't got as much money as she ought to have gotten * * for the purchase price of the mill property and she felt she ought to have had more money out of it." Willis said that he advised John that it was not necessary to procure a release, because "he didn't owe them anything"; but that the latter "thought it was worth a small amount to avoid any trouble or question between E. K. Jones and his family, he'd rather pay something than have any hard feelings in the matter." Willis states positively that the release was signed by Elihu and his wife, and that John paid them for the release. Willis was corroborated by Charles H. Chance, who is now city attorney of Lewiston, Idaho, but in 1895 was working as a clerk in Willis' office. Chance testified that he remembered about Elihu and Emma J. Jones coming to the office for the purpose of signing the release. He says that he prepared the original release and the carbon copy, and he identified the "red ink figures 2695," appearing on the copy and indicating the file number, as his handwriting. Herman also testified that he was present and saw the release signed, and that the purpose of the transaction was to satisfy the "dissatisfied feelings" of Emma J. Jones. Birdie stated that she was present on one occasion when Elihu told her father that "Emma had sent him to say that she was not satisfied with the price that father had paid for the mill and stock." W. H. Grindstaff testified that Elihu at one time told him "that his wife and children were not altogether satisfied with the amount of money they had received for the mill," and that shortly afterward he saw Elihu again and "he told me that he and his wife had seen J. H.

Jones, and that he had paid his wife some money * * and that she was perfectly satisfied and so was he." Grindstaff also stated that, not long after the second conversation, with Elihu, he was in John's office on some business with reference to insurance, and John showed him the typewritten receipt signed by Elihu and Emma J. Jones, and that then "he turned it over to Mr. Rogers who was then book-keeper at the mill." J. T. Rogers was the book-keeper in the mill from 1895 until some time after 1899; but his testimony was not available because he died two or three years prior to the trial. We would not be warranted, in the face of all of this evidence, some of which comes from disinterested witnesses, in finding that the release was not signed by Elihu and Emma J. Jones.

It is true that some of the plaintiffs tell about conversations, one of which was as late as 1905 or possibly as late as 1906, between their mother and John in which she asked him when he was going to reconvey the mill, and he answered to the effect that he had not yet gotten his money out of the mill; but it is also true that no demand for an accounting was made prior to the commencement of this suit. One of the plaintiffs says that Elihu spoke to Herman about returning the mill, and Herman assured Elihu that the mill would be returned when Herman got his money out of it. Herman denies that he ever promised to reconvey the sawmill property, and he and the other defendants asserted that not until the commencement of this suit did they hear of the contention now made by the plaintiffs.

The delay of the plaintiffs in asserting their claims argues strongly against them. John did not die until more than ten years after the execution and delivery of the deed, and this suit was not com-

menced until April, 1917, or more than eleven years
after John's death. In other words, nearly twenty-
two years were permitted to pass before any demand
for an accounting was made. The plaintiffs admit
that neither they nor their parents ever demanded
an accounting from John, and they also admit that
they never asked that an accounting be made by
Herman until the commencement of this suit. After
the Jones Lumber Company acquired the assets of
the E. K. Jones & Company, it caused the signs to
be changed so as to notify all persons that the mill
was being operated by it. Since 1895, the mill
has been greatly improved. Its capacity has been
doubled. The deed of 1895 transferred 3½ acres to
John. Since that time an additional 10½ acres have
been purchased, so that now the sawmill property in-
cludes about 14 acres. After 1895, John treated
the E. K. Jones & Company stock standing in his
name as his own. After the execution of the deed
and during the remainder of his life John always
treated the sawmill property as his own property.
In 1902, the John Halsey Jones Company, which was
only a holding corporation for John, mortgaged the
sawmill property to the Security Savings & Trust
Company for $8,000, and in this mortgage the John
Halsey Jones Company covenanted that it had "a
valid and unincumbered title in fee simple to said
premises."

Elihu and his wife lived in the same home from
1892 until they died. This home was near the saw-
mill and was where they could not but see what was
being done in and around the sawmill property. It
must be remembered that the plaintiffs contend that
the mill was to be returned whenever the debts were
paid; and yet, notwithstanding the change made in

the signs when the Jones Lumber Company began to operate the mill, and the material improvements in the mill, and the substantial enlargement of the mill-yards and all the outward appearances of prosperity, no demand was made by any person upon any person for an accounting until nearly twenty-two years had passed.

2, 3. The voluminous transcript and the numerous exhibits accompanying this appeal have been examined, studied and considered with a full realization of the importance which a decision of this litigation must have for the parties to it; but after giving to the record our most careful consideration, we are unable to say that the plaintiffs have sustained the heavy burden which the law imposes upon a party who claims that an instrument, in form a deed, is in reality a mortgage: *Harmon* v. *Grants Pass Banking & Trust Co.,* 60 Or. 69, 74, 80 (118 Pac. 188).

The decree appealed from must be affirmed, but without costs in this court.          AFFIRMED.

JOHNS, BENSON and BURNETT, JJ., concur.