Argued at Pendleton May 6; reversed September 4. 1930

## SWEEK ET UX. *v.* BENNETT ET UX.
(290 P. 747)

*C. H. Leonard* of Burns and *Irving Rand* of Portland (J. W. Biggs of Burns, on the brief) for appellants.

*Mark Weatherford* of Albany (Weatherford & Wyatt of Albany, on the brief) for respondents.

BELT, J. This is a suit to have an instrument purporting to be a deed declared to be a mortgage. In 1903 plaintiffs became owners in fee of 225 acres of land, the greater part of which was located within the corporate limits of the city of Burns in Harney county. On September 26, 1921, they executed an instrument in the form of a quitclaim deed conveying this property to the defendant, S. R. Bennett, and his wife, a daughter of the plaintiffs. At such time the land was encumbered by a mortgage in favor of the State Land Board, dated May 16, 1910, and due one year after date. There was a second mortgage in favor of C. H. Leonard in the sum of $6,500, dated January 12, 1921, bearing 10 per cent interest and due three years after date. In addition to the mortgage indebtedness there were other debts aggregating between $4,000 and $5,000,—taxes amounting to $292 soon due and, on October 1, 1921, $300 in interest was due on the State Land Board mortgage. The property was further burdened by an improvident five-year lease to J. E. Pope, commencing April 1, 1920, wherein the lessee was guaranteed $10 per ton for his third of the hay crop.

Plaintiffs had long since exhausted their credit and were in great financial distress. Harney county unquestionably was at the low ebb of business depression. There was no market for land and mortgage foreclosures seemed to be the order of the day. About the only ray of hope was the long discussed coming of the railroad and the development of a large timber tract which the government was being petitioned to release. Plaintiffs had practically abandoned the farm and had moved to Corvallis for the purpose of educating two of the younger children of their family of ten. Plaintiff was a lawyer of about 30 years' experience

and, although he was nearly 70 years of age, became associated with a firm of lawyers in that city. His income from such source, however, was inconsequential and was not sufficient to meet living expenses. The defendant Bennett was employed by the government as a sort of supervisor and ranger in the National Forest service at a salary of $2,000 per year, together with all expenses. He and his wife, each about 30 years of age, by industry and thrift had accumulated about $2,000. They also owned 320 acres of land. In view of their station in life it might well be said that they were in moderately good financial circumstances. Sweek had been informed by the State Land Board that if the interest on its mortgage was not paid when due it would be assigned to Leonard. Sweek believed that Leonard was eager to purchase this mortgage and would foreclose. In desperation plaintiffs applied to Ed Southworth, another son-in-law, for a loan of $6,-500 with which to satisfy the second mortgage. Southworth and his wife examined the property and decided it was not good security. Plaintiffs then offered to deed the property to the Southworths if they would assume the idebtedness against it, but they refused. Plaintiffs then unsuccessfully endeavored to borrow from defendants. Under such circumstances was the instrument in question executed.

Plaintiffs assert that it was made pursuant to an agreement whereby the defendants would manage and control the property until a portion thereof could be sold to satisfy the encumbrances against it and that they would advance for and on behalf of plaintiffs the sum of $2,000 with which to pay delinquent taxes and interest and that when such purpose had been accomplished the defendants would reconvey the property

to the plaintiffs; provided further that defendants would be paid interest on all moneys advanced and also the reasonable value of services rendered in the management of the property. Defendants claim it was an absolute and unconditional conveyance.

On September 26, 1921, Sweek wrote to the defendant S. R. Bennett, "I am sending you today the deed to the ranch, and would advise that you file it for record on the evening of the 29th or the forenoon of the 30th. I want your deed of record the day before L. (Leonard) buys the note from the land board, and leave it to him to get wise." On the same day he wrote to his daughter, Alice Bennett, "I wrote Bob a short letter at Burns in regard to the land. In regard to paying in any money, that you must determine from the future prospect. That is one reason why I told Bob not to pay any money out. So far as farming the land and ever getting out there is no possible chance. The only show for any profit is a sale in the future. Should development fail you would lose your money. We can take the chance without losing any of your money. But Bob may do whatever he thinks best. Do not take too much of a chance. So far as Leonard being square there is nothing to it. Had I remained with Fred Haines there would not have been any trouble. Unless Bob is sure the land pay back his money I want him to keep his money out of it. The increased value of the land is all there is in it." On October 4, Sweek wrote to defendants: "We have both of Bob's letters; one from Burns on the 30th ult. and one on Oct. 2d. And Mamma and I have read them with much care. While the future of this undertaking is under your absolute control, we both feel that to undertake to farm the land and quit your place means the loss of

the property and the money you have invested as well as ours. You and Myssie figure carefully the maximum crops, the expense and the prospective price and you will find that after paying you for what you can earn where you are the entry will be in the red. It is not for us to say what you should do; but we do not desire to see you lose your present place and the land. Next year will be a bad year to sell farm products and I know that interest and taxes can not be made out of the land. In our judgment a lease to Frank Jackson will be safer than to undertake to run the place. But you have your money in it and must do as you think best. If my business continues to grow we can help out next fall. I wish you would write me fully all about the arrangements with Leonard.'' Other letters from Sweek also plainly indicate that he regarded the property as poor security for the indebtedness against it and that the Bennetts were engaging in a very doubtful business enterprise. It is also clear from the numerous letters of Sweek that he was anxious that the property should not go to his creditors. He seemed particularly desirous of beating Leonard in the event he purchased the mortgage from the State Land Board, notwithstanding it was Leonard's financial assistance in 1916 that had enabled him to avoid an assignment for benefit of his creditors. Bennett claims that he wrote Sweek a letter—which was not produced—to the effect that if he took a deed to the property it must be unconditional and without any strings on it. He states that, in answer thereto, Sweek wrote: ''Mamma and I are out of it now and the whole management must be left to you.'' This letter is in evidence. On September 30, 1921, Bennett replied, ''I was glad to get your letter and you told me just what I wanted you to.''

After receiving the quitclaim deed, wherein Bennett and his wife were named as grantees, Bennett purchased Pope's interest in the lease for $125, paid interest on the State Land Board mortgage, and made other arrangements to refinance the property. Then it was that the plaintiff, by letter dated October 16, 1921, first indicated in any of his numerous letters that he had not made an absolute conveyance of the property to the defendants. He wrote: "We have your last letter and note what you intend doing. If you find that you will need your money in the spring give Mamma and (me) 90 days notice that we may take this up if we can. The 80 can not be sold for its value in 1922. And when it is sold it will be some time before the remainder can be sold to any advantage. If you believe there is anything in farming the ranch you may have all you can make off from it for two years as interest on your money, and if you can not make enough to do that Mamma and I will not object to a sale. We will be in position to take care of the interest and taxes and interest unless unforseen misfortune overtakes us." It is noted that the letter of October 16, 1921, is inconsistent with the agreement as alleged by the plaintiffs in their complaint. We think the offer to repay Bennett on 90 days' notice was a mere gesture. Sweek was absolutely without credit and had no funds. When Bennett received this letter from his father-in-law in Corvallis he was much disturbed about what Sweek intended. He was fully determined not to make further investment until Sweek had disclaimed any interest in the property. With this idea in mind he sought the advice of J. W. Biggs, an attorney in the city of Burns. Mr. Biggs testified that he dictated a letter to Sweek at Corvallis, Oregon, requesting the execution of a warranty deed and also a written disclaimer of any

interest in the property. On December 2, 1921, he returned the deed, as requested, to the defendants. Sweek says that he executed this second deed because Bennett had written to him that "Gowan as local attorney for the land board won't approve that abstract with that quitclaim deed and I have to have a warranty deed before he will do that." The letter, however, was not offered in evidence. Neither was a carbon copy introduced of the letter which Mr. Biggs said was written to the plaintiffs requesting execution of the deed. After the warranty deed was received, Bennett says that Sweek wrote a letter disclaiming any title to the property. Biggs, Leonard and Mrs. Bennett are positive in their testimony about having seen such disclaimer. Mrs. Bennett states that this important letter was placed in her trunk and intimates very strongly that her mother obtained possession of it in a manner not redounding to her credit. Like most of the documentary evidence material to the case, the alleged disclaimer was not offered in evidence. It is difficult, however, to conceive that Biggs and Leonard could be mistaken as to the existence of this letter and this court is convinced that they did not commit perjury with reference thereto. Both of these gentlemen have had long and honorable experience in the practice of the law and, even though they are of counsel in this case, it can not be believed that their interest in a client would cause them to wilfully misstate the facts.

In 1924 the defendants obtained a loan of $7,000 from the Federal Land Bank of Spokane, giving as security a mortgage upon the land in controversy and also a mortgage upon 320 acres of timber land. From the proceeds of this mortgage and from the sale of lots, which were platted in 1923 and 1924, the State

Land Board mortgage and the Leonard mortgage were satisfied. The plaintiffs made no demand upon defendants to reconvey the property until the day before this suit was filed on April 22, 1929. If the contract was as alleged by the plaintiffs, it is highly probable that there would have been some discussion about a reconveyance during the interim of eight years in which defendants were in possession.

■ In passing on a question of fact where there is such a direct conflict, the court, in its analysis of the evidence, must be governed by the rule of probability. Is it reasonable that the Bennetts would have entered into such a contract as alleged by plaintiffs? Bennett had a good position with the government and had money in the bank. He knew that the income from the land would not pay the taxes and the interest on the mortgages. Sweek had always been in difficulty with his creditors. There was no likelihood that Sweek would ever be in a position to pay him reasonable compensation for his services. Under these circumstances, it is highly improbable that defendants would have put their hard-earned money into this property and would have worked so industriously for many years had the conveyance to them been other than an absolute deed. It is conceded that, had not the Bennetts come to the aid of Sweek in 1921, the property would undoubtedly have gone to his creditors. We believe that Sweek desired to favor his son-in-law rather than see the property go, perhaps, to Leonard, the second mortgagee, for whom he entertained ill will.

Sweek was a lawyer of experience. Why did he make a conveyance of the property to the defendants purporting to create an estate by the entirety? If a

trust relationship was desired, it was not necessary to join the wife in the deed. His explanation is not convincing. Justice BURNETT, considering a similar question, in *Chance v. Graham*, 76 Or. 199 (148 P. 63), wherein a conveyance was made to a daughter and her husband, said:

"It is a strong circumstance against the existence of a trust that he transferred it to the man and wife, instead of to either of them alone. If a trust was intended, it is most likely that he would have bestowed the title upon the one alone best qualified to manage the same successfully, and no good reason is suggested why the confidential estate should be vested in the daughter and her husband together."

If Sweek was so careful to make the conveyance to the defendants as husband and wife for the reasons stated, it is difficult to understand why he did not prepare a memorandum agreement setting forth the terms under which it was made.

 Furthermore, the instrument is presumed to be what it purports to be. The burden of establishing it to the contrary rests upon the plaintiffs. He who claims that an instrument in form a deed is in reality a mortgage has a heavy burden: *Jones v. Jones*, 96 Or. 197 (189 P. 896); *Harmon v. Grants Pass Banking & Trust Co.*, 60 Or. 69, (118 P. 188). As stated in 19 R. C. L. 263:

"Evidence is not sufficient to establish such conveyance to be a mere mortgage unless it is clear and unambiguous. It must be, according to various statements, clear and convincing; clear and satisfactory; plain and convincing; * * * or clear, unequivocal and convincing."

Plaintiffs can not prevail in a doubtful case.

██ We are not unmindful of the consequences of this decision to this aged couple, but a careful study of the

record convinces us that they have not sustained the burden of proof. They made an absolute conveyance of this property and it is inequitable to take it away from the defendants who saved it from financial wreck by good business management, thrift and industry.

The decree declaring the conveyance to be a mortgage and awarding a judgment of $7,836.68 against defendants on accounting is reversed and the cause remanded with directions to enter a decree in favor of defendants in accordance herewith.

McBRIDE, J., absent; RAND, J., not sitting.