Submitted on briefs June 1; affirmed July 14; rehearing denied
September 7, 1938

## COLAHAN ET AL. *v.* SMYTH ET AL.

(81 P. (2d) 112)

In Banc.

*J. H. Napier*, of Klamath Falls, for appellants.
*A. C. Yaden*, of Klamath Falls, for respondents.

BEAN, C. J. In 1926 the defendants William Orville Smyth and Viola Ruth Smyth borrowed $700 from one E. L. Hopkins, at 10 per cent interest, and secured payment thereof with a mortgage on their land, consisting of a grazing homestead of 640 acres and a farm of 160 acres. The defendants maintained their home on the land for several years and were in possession of both tracts, which are about a mile apart. According to the proof, its value, about $10 per acre for the farm and from $1 to $1.50 per acre for the grazing homestead, has been stationary.

In 1929, the debt not having been paid, Hopkins filed a suit to foreclose his mortgage. The defendants made no appearance and a decree of foreclosure was regularly entered and the land was sold pursuant to the decree on November 2, 1929. On November 4, 1929, the Smyths executed and delivered to Hopkins a quitclaim deed to the land and on the same date E. L. Hopkins executed to the Smyths a lease of the land from November 4, 1929, to November 4, 1930, describing the land and specifying

"that the said lessee, William Orville Smyth, is to drill a well on said place; that he is to pay all taxes assessed against said property prior to the time that said taxes become delinquent; that failure to pay said taxes at any time before they become delinquent is a cancellation of this lease and the lessee shall immediately vacate said premises and surrender possession thereof. Lessee further promises to pay to the lessor on or before the 1st day of November, 1930, the sum of One Hundred Thirty-five and no/100 Dollars. If lessee makes said payment and improvement for the year 1929, he is to have an extension of the time of this lease from year to year for the term of three years, provided always, that he makes payment of taxes and the rents herein stipulated at the times specified. It is further stipulated and agreed that if the lessee complies with agreements of this lease, that he may, at any time within three years from date hereof, purchase said land upon the payment of the sum of One Thousand Three Hundred Fifty & No/100 Dollars cash, to the lessor herein."

which rent the Smyths covenanted to pay and to return said premises at the expiration of said time in good order and condition.

A deed to the land was prepared and signed by Hopkins and wife to the Smyths and placed in the bank in escrow, so that the Smyths could obtain the same upon payment of the amount due to Hopkins and the price of the land.

Strong effort was made by the Smyths from time to time to obtain the money to purchase the land, but without avail. In March, 1930, E. L. Hopkins and his wife, as he was expecting some litigation with the Federal Land Bank of Spokane, executed a warranty deed conveying the premises in question to his step-daughter, Lela R. Bonham. In December of the same year Hopkins received a sheriff's deed to the premises sold in the foreclosure suit.

Mrs. Viola Ruth Smyth appears to have looked after the business more than her husband, and she testified that the deed given by the Smyths to Hopkins was given as security for the money they owed to Hopkins. Hopkins testified, in effect, that he took a deed and leased the land back to the defendants as he would to anyone.

It is shown and practically admitted that Mrs. Lela R. Bonham received the conveyance from Hopkins and wife understanding and knowing all in regard to the deed that was given by the Smyths to Hopkins and the lease from Hopkins to the Smyths.

We read in 1 Wiltsie on Mortgage Foreclosure (4th Ed.) 18, § 14:

"Where a deed was intended as a mortgage, a subsequent purchaser who takes the property with knowledge of the nature of the original transaction or with knowledge of the facts sufficient to charge him with the nature of the transaction, takes subject to the rights of the original grantor. He occupies the position of an assignee of a mortgage and holds the property subject to the right of the original grantor to redeem."

On January 27, 1935, Mrs. Bonham, desiring to raise some cash, offered to take $1,000, and interest, from the Smyths in full settlement for the land.

At the time of the execution of the deed from the Smyths to Hopkins, Mr. E. L. Elliott, Hopkins' attorney, figured up the entire indebtedness which all the parties agreed to, and he drew the lease from Hopkins to the Smyths, which was a regular, valid demise.

It appears from the testimony that the arrangement for the lease was perfectly satisfactory to the Smyths, especially to Mrs. Smyth. It is noticeable that in the first part of the agreement in the lease there was included the following words: "that this lease is made subject to sale at any time  *  *  *;" This language was stricken out. Apparently, as we understand the testimony, Mrs. Smyth was not satisfied to have an agreement that the lease should be subject to sale, and it was changed by striking out the words quoted, but they are easily read.

As stated, it is claimed by defendants that the deed given by them to Hopkins was in effect a mortgage. This is the question in the case.

■ It is a well-settled principle of law in this state that a deed, absolute upon its face, may be shown by parol evidence to be intended as a mortgage to secure the payment of money: *Grover v. Hawthorne Estate*, 62 Or. 77 (114 P. 472, 121 P. 808), and cases there cited. In 1 Wiltsie on Mortgage Foreclosure (4th Ed.) 20, § 15, we read:

"There is an implied defeasance clause in an equitable mortgage and such a defeasance clause may be proved by parol and read into a written instrument. Whether a certain transaction constitutes an equitable mortgage depends upon the intent of the parties. The intent is the crucial test. But there must be some specific agreement between the parties."

Mrs. Bonham notified the Smyths by letter dated January 27, 1935, that unless they raised the money and

paid her she would sell the land to someone else. On November 30, 1935, she and her husband executed a contract of sale to the plaintiff Joseph M. Colahan to sell the land for the sum of $1,000, subject to any and all taxes then due against said premises. About that time the defendants Smyths arranged with one John M. Anderson to obtain $1,080, the amount offered to be taken by Mrs. Bonham, and interest. A deposit of $100 was made by Anderson "as earnest money rè Bonham Smyth Land deal," to apply on the purchase of the Smyth property at $1,080, conditioned that Colahan would surrender his purchase contract on said land from Mrs. Bonham as a part of the purchase price of $1,080, balance of $980 to be paid within five days from tender of the deed, "all conditioned upon release of Colahan contract. Said $100 to be forfeited if deed is tendered and balance of $980.00 is not paid within said 5 days. If deed be not tendered within ten days the above $100 to be returned to John M. Anderson." Nothing was accomplished in this respect as to the payment of the land and the $100 was tendered and returned.

It is shown that Smyth drilled a well on the land as part payment of rent of the land, and that a crop of hay was raised and a portion given to Mrs. Bonham, and, as she states, a portion was left for the tenants. As the Smyths had stock to feed, arrangements were made through Mr. Anderson for the Smyths to purchase the Bonham share of the hay. There was paid by Anderson to Mrs. Bonham $280, with some interest, on a deal for hay and cattle. This hay, Mrs. Bonham states, was for rent.

It appears plainly from the record that E. L. Hopkins had a mortgage to secure the payment of his debt which, with interest, taxes and costs in the foreclosure suit, amounted to $1,350, and this mortgage was fore-

closed. It would certainly not be presumed that Hopkins would take a deed as a mortgage or as security for his debt and release and give up his mortgage.

In 1 Jones on Mortgages (7th Ed.) 435, § 326, we read:

"If the transaction was based upon a mortgage previously existing between the parties, and the mortgage notes were given up and no other evidences of debt were taken in their place, and the mortgagor was credited with the amount of the mortgage notes upon his making an absolute conveyance of the mortgaged land to the mortgagee, the presumption is strong, if not conclusive, that such absolute conveyance was not intended to operate as a mortgage.

"It is wholly improbable that a creditor, already having a mortgage to secure his demand, should take another mortgage in the form of an absolute conveyance of the same property, for the same debt, without any apparent advantage."

■ It is an invariable rule that "once a mortgage, always a mortgage". If the deed from the Smyths to Hopkins was intended as a mortgage, it would be necessary for such deed to be foreclosed as a mortgage, and, as there has already been one foreclosure of the mortgage to secure the debt due to Hopkins, if another foreclosure was required, it would entail expense for the mortgagee E. L. Hopkins, or Mrs. Lela R. Bonham, and it would also impose an additional burden of costs upon the Smyths.

■ The intention of the parties at the time an agreement is consummated to execute a deed determines whether title to the property is to be irrevocably transferred or the conveyance, though absolute in form, is to be merely as security for the payment of a debt or the performance of an obligation. In order for defendants to have the deed, which is an absolute conveyance, as

shown upon its face, declared a mortgage, it is incumbent upon such defendants to prove by clear and convincing evidence that the instrument was simply security and not an absolute deed: *Harmon v. Grants Pass Banking & Trust Co.*, 60 Or. 69 (118 P. 188).

It is stated in 1 Wiltsie on Mortgage Foreclosure (4th Ed.) 12, § 10:

"Ordinarily, the test to determine whether a deed, coupled with an agreement by the grantee to reconvey the property effects a mortgage is whether there is an unsatisfied indebtedness owing the grantee which is enforceable, independent of the deed.

\*       \*       \*       \*       \*       \*       \*

"There must be some proof showing an equity requiring that the transaction be held a mortgage."

In the present case the note given by defendants to Hopkins was merged in the decree and no longer existed as a note. The decree was satisfied by the sale of the land.

Mrs. Bonham's offer to take $1,000 and interest, $80, was not acted upon, or attempted to be acted upon, until long after it was made and after she made a contract to sell the land to Colahan. The defendants tendered $1,080 in payment for the land, but, according to their stipulation in the lease, the amount due is $1,350. It was difficult, and took a long time, for the defendants to make arrangements to obtain $1,080.

■ Where a party seeks relief by having a deed adjudged a mortgage, he must show willingness to do equity by paying the mortgage debt. In the present case the record does not indicate the defendants are either willing or able to pay the amount agreed upon as the purchase price for the land.

■ The law imposes a heavy burden of proof on a party who claims that an instrument in the form of a

deed is in reality a mortgage: *Jones v. Jones,* 96 Or. 197 (189 P. 896) ; 1 Jones on Mortgages (8th Ed.) 352, § 299.

Mr. Hopkins, now deceased, and Mrs. Bonham appeared to have endeavored to render assistance to the defendants in attempting to obtain money as a loan from different sources. They did not attempt to drive a hard bargain with defendants, or to do anything inequitable.

■ After a very careful reading of the testimony and an examination of the many exhibits, we are compelled to conclude that the defendants have not shown by satisfactory evidence that the deed in question was intended to be or is, in effect, a mortgage.

■ There was a similar judgment entered in a so-called law action which is an exact copy of the decree in the equity suit. The matter was all determined in the equity suit. There was nothing further to try in the law action and the court properly rendered a decree determining the case. See § 6-102, Oregon Code 1930.

The judgment and decree of the circuit court should be affirmed. It is so ordered.